## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:04CR547 |
| | ) | |
| vs. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| JOSE H. VALLES-JUAREZ, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the motion to suppress filed by the defendant Jose H. Valles-Juarez (Valles-Juarez) (Filing No. 22). The defendant is charged in a four-count indictment with conspiracy to distribute over 500 grams of methamphetamine (Count I) in violation of 21 U.S.C. § 846; possession with intent to distribute 5 grams or more of methamphetamine (Count II) in violation of 21 U.S.C. § 841(a)(1) and (b)(1); carrying a firearm in relation to a drug trafficking crime (Count III) in violation of 18 U.S.C. 924(c); and forfeiture of currency (Count IV) pursuant to 21 U.S.C. §853. Valles-Juarez seeks to suppress all physical evidence and statements obtained as a result of the warrantless entry into his house on November 16, 2004.

On April 21, 2005, the Court held an evidentiary hearing on the motion. Omaha Police Department (OPD) Officer Joseph Baudler (Officer Baudler), OPD Officer Scott Beran (Officer Beran), OPD Officer Antonio Espejo (Officer Espejo), and Maria Azucena Nieto Escobar (Ms. Nieto) testified during the hearing. **See** Filing No. 26. The Court received into evidence a permission to search form (Exhibit 1) and a photograph (Exhibit 111). **See** Filing No. 27. The redacted transcript of the hearing was filed on May 12, 2005 (TR.). **See** Filing No. 30. Valles-Juarez filed a brief (Filing No. 23) in support of his motion. The government did not file a brief in opposition to the motion to suppress. There was no post-hearing briefing.

## FINDINGS OF FACT

In the evening on November 15, 2004, Officer Baudler[1] and his partner Officer Beran[2] stopped a vehicle in the area of 43rd and Miami Streets (TR. 14, 115). The officers discovered methamphetamine on the passenger, Silverio Mata (Mr. Mata), and in the vehicle's glove compartment (TR. 15, 116). The vehicle title was in the name of Jose Valles, the defendant, to an address on 25th Avenue (TR. 76). Mr. Mata later made a statement to officers that he received the methamphetamine the day before from the defendant at the defendant's residence, on 25th Avenue, to where Mr. Mata directed the officers (TR. 16-17, 76, 116). Mr. Mata also stated the defendant carried a .45 caliber pistol on his hip (TR. 23). Mr. Mata told the officers that the defendant spoke English (TR. 30). Finally, Mr. Mata told the officers that the defendant's brother, from Colorado, who was also involved in drug trafficking, was staying with the defendant at the residence (TR. 31). The officers observed a vehicle parked in the driveway at 25th Avenue with Colorado license plates (TR. 72). At the time of Mr. Mata's statements the officers knew Mr. Mata was the member of a gang and had been involved in gang related and other crimes (TR. 61-64, 67).

After booking Mr. Mata at approximately 11:30 p.m., the officers returned to the defendant's residence on 25th Avenue (TR. 18). The officers discussed the option of conducting a "knock and talk" at the residence or obtaining a search warrant, but decided to forgo a search warrant because of the lateness of the hour (TR. 19-20). Officer Baudler testified their shift was supposed to end at 11:30 p.m. (TR. 21). The officers contacted four additional officers, including two uniformed officers, to assist in contacting the defendant (TR. 21, 24).

At approximately 12:15 a.m., Officer Baudler and one or two uniformed officers approached the defendant's residence (TR. 25). Initially, Officer Beran was assigned to observe the perimeter of the residence (TR. 118). Through a window, Officer Baudler

---

[1] Officer Baudler has been an OPD officer for sixteen years and is currently assigned to the northeast precinct gang suppression unit (TR. 13-14).

[2] Officer Beran has been an OPD officer for over nine years and is currently assigned to the gang unit (TR. 115).

observed a man, later identified as Valles-Juarez, standing on a chair changing a light bulb on the main floor of the residence (TR. 25-26). After Officer Baudler knocked, Valles-Juarez answered the door by opening the inner door to the residence (TR. 26). Officer Baudler asked Valles-Juarez if the officers could come in and talk to him (Valles-Juarez) (TR. 28). Valles-Juarez appeared curious and allowed the officers to enter(TR. 27-29). Valles-Juarez and the officers stayed in the entryway (TR. 29). Officer Baudler told Valles-Juarez that the officers had received a call about a disturbance at the residence and asked whether any other people were present (TR. 30). Officer Baudler lied to Valles-Juarez about receiving such a call, but wanted to find out if others were present in the residence (TR. 30, 32). Officer Baudler was concerned about officer safety based on the information that Valles-Juarez carried a weapon and another person was at the residence (TR. 31). Officer Baudler testified that, in his experience in drug investigations, drugs and weapons often go hand in hand and that drug traffickers use weapons to protect themselves from police officers and from competitors (TR. 33-34). Officer Baudler is aware of instances where violence was used against officers during drug investigations and searches (TR. 34).

In response to Officer Baudler's statement, Valles-Juarez said there was no disturbance in the residence (TR. 35). Officer Baudler then requested permission to search the residence to determine the number of people present (TR. 35). Valles-Juarez said, "yes," indicating the officers may search for other people (TR. 35). Officer Baudler made no threats or promises to induce Valles-Juarez to consent to the search for other persons (TR. 36). Officers conducted a sweep of the house for persons and found one adult male, one adult female, Ms. Nieto, and a two-year old child sleeping upstairs (TR. 37-38, 196, 201). Ms. Nieto is Valles-Juarez's girlfriend (TR. 196). The adult male was Valles-Juarez's brother (TR. 198). The three people were brought downstairs to the living room (TR. 38). Officer Beran conducted a protective sweep of the basement to check for other persons by walking from the living room area, through the kitchen and down a staircase (TR. 120). Officer Beran did not see any people in the basement, but did see several closed boxes, which he did not open at that time (TR. 122-23).

After assembling the people staying in the house, Officer Baudler informed them the officers were actually conducting a narcotics investigation, rather than a disturbance call (TR. 39). The three adults appeared to understand what Officer Baudler told them, in English, and none of the adults appeared to be under the influence of drugs or alcohol (TR. 39). Officer Baudler asked Valles-Juarez to talk privately in another room (TR. 39). Valles-Juarez agreed (TR. 39). Officer Baudler did not make any promises or threats to induce Valles-Juarez to agree (TR. 40, 132). None of the officers had drawn their weapons (TR. 27, 40). The time frame from the initial entry until Valles-Juarez accompanied the officers upstairs was between five and twenty minutes (TR. 40, 162).

Officers Baudler, Beran and Espejo[3] went upstairs with Valles-Juarez to a bedroom (TR. 40, 125, 163). Valles-Juarez was seated in the room, but the officers were standing (TR. 42). Officer Baudler informed Valles-Juarez that the officers had received information Valles-Juarez had a firearm and narcotics in the house, specifically that the narcotics were kept in a box in the basement (TR. 41). Officer Espejo translated the conversation in Spanish for Valles-Juarez, although Valles-Juarez spoke some English (TR. 126-27). Officer Baudler also asked for permission to search the residence (TR. 41). Initially, Valles-Juarez denied there was a firearm or narcotics in the residence, but then admitted the presence of a firearm (TR. 41-42). After admitting there was a firearm in the kitchen, Valles-Juarez granted the officers permission to search (TR. 43, 132). Valles-Juarez continued to deny the presence of narcotics in the residence (TR. 43). After Valles-Juarez orally granted permission to search, the officers presented Valles-Juarez with a permission to search form, which Officer Espejo explained, in Spanish (TR. 43, 46-47, 130, 164-65). Valles-Juarez signed the consent to search form (TR. 43; Exhibit 1). The officers did not make any threats or promises to induce Valles-Juarez to sign the form, nor were their weapons drawn (TR. 47, 131-32). Valles-Juarez appeared to understand what the officers were saying and the consent form (TR. 47, 166).

---

[3] Officer Espejo has been an officer with OPD for four and one-half years and is currently assigned to the south gang unit (TR. 159). Officer Espejo speaks Spanish, which he learned from his parents (TR. 163). Officer Espejo sometimes assists other officers by translating between English and Spanish (TR. 163).

Valles-Juarez did not tell the officers to stop searching or that he did not want them to search (TR. 54). Valles-Juarez was not wearing handcuffs at that time (TR. 131).

After Valles-Juarez signed the consent to search form, the officers began to search the residence (TR. 47). Officers Beran and Espejo stayed with Valles-Juarez (TR. 133). Officer Baudler went to an area in the basement where Mr. Mata said drugs would be present (TR. 48). Officer Baudler found a cardboard box which contained methamphetamine, packaging material, some cutting agent and some marijuana (TR. 48). Officer Baudler notified the other officers what he had found (TR. 49-50). The officers also found a firearm in a cabinet where Valles-Juarez told them it would be (TR. 51). Additionally, the officers found over $3,000 in U.S. Currency, a digital gram scale and three grams of methamphetamine in a kitchen cabinet (TR. 52, 110).

After contraband was found in the residence, Officer Beran, with the assistance of Officer Espejo, advised Valles-Juarez of his rights under *Miranda* and placed him in handcuffs (TR. 135, 171). Officer Beran would state each right in English and Officer Espejo would translate into Spanish (TR. 135-36, 171). Valles-Juarez agreed to talk to the officers and the conversation lasted approximately five to twenty minutes (TR. 138, 173). During the exchange with Officers Beran and Espejo, the officers did not make any threats or promises to induce consent to make a statement (TR. 139). Valles-Juarez did not ask for an attorney or to stop the conversation (TR. 139). Valles-Juarez appeared to understand the conversation and did not appear to be under the influence of drugs or alcohol (TR. 137, 140).

Officer Baudler testified that if Valles-Juarez had refused the officers' initial entry into the residence, the officers would have attempted to secure a search warrant based on the other information they had received (TR. 56). Further, if Valles-Juarez not consented to a search of the residence, the officers would have stayed in the residence and sought a search warrant (TR. 56-57, 105). Officer Baudler believed that under either alternative the officers had probable cause and a search warrant would have been issued by the Douglas County Court Judge on duty (TR. 57). However, Officer Beran testified that, after talking to Mr. Mata, he did not believe the officers had probable cause to obtain a search warrant (TR. 146).

The Court took judicial notice of the defendant's age, age 26, which evidence was contained in court records (TR. 204). Additional counsel stipulated the defendant was five foot six inches tall and weighed 170 pounds in January 2005 (TR. 205). Officer Baudler is six foot 2 inches tall and weighs 210 pounds (TR. 106). Officer Beran is five feet eleven inches tall and weighs 210 pounds (TR. 151).

## ANALYSIS

### A.    Consent to Search

Valles-Juarez challenges the officers' search of the residence. Valles-Juarez contends that because the officers used a ruse, in conjunction with the other circumstances of Valles-Juarez's verbal and written consent to search, the consent was not voluntary. The government contends officers received voluntary and knowing permission to enter, conduct a protective sweep and, later, to search the residence from Valles-Juarez.

A consent search of a residence must be voluntary. The Fourth Amendment test for valid consent to search is that the consent be voluntary, and such "[v]oluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette,* 519 U.S. 33, 40 (1996). Some personal characteristics that aid in determining voluntariness of consent are age, intelligence, whether an individual was under the influence of drugs or alcohol, whether an individual was read his *Miranda* rights, and whether an individual had experienced prior arrests. *United States v. Welerford*, 356 F.3d 932, 936 (8th Cir. 2004). The court can also look at environmental factors including, the period of time that the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent occurred in a public or secluded place; and whether the individual objected or stood by silently while the search occurred. *Id.*; *United States v. Contreras*, 372 F.3d 974, 977 (8th Cir. 2004).

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority."

6

*Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (footnotes omitted). "The government bears the burden of proving voluntary consent [to search] by a preponderance of evidence." *United States v. Galvan-Muro*, 141 F.3d 904, 907 (8th Cir. 1998).

Valles-Juarez contends there is a heightened standard when the officers use a ruse to gain entrance into a residence citing *United States v. Benezario*, 339 F. Supp. 2d 361, 368 (D. Puerto Rico 2004). In *Benezario* the officers used a ruse, to search for a fugitive, to gain consent to enter the residence and conduct a protective sweep. However, unlike this matter, in *Benezario* the officers returned to search a bedroom closet to search a duffle bag, without consent. Accordingly, the *Benezario* court determined the officers exceeded the scope of the initial consent to conduct a protective sweep when they conducted a second non-consensual search and searched where they had no permission to be. *Benezario*, 339 F. Supp. 2d at 368-69. However, no "heightened" standard is necessary whereas, as here, the officers were legally present and no taint infected a subsequent voluntary consent. Further, there is no evidence the officers exceeded the scope of the initial consent to conduct a protective sweep or searched for contraband at that time.

In the present case, no evidence suggests Valles-Juarez was threatened, intimidated, or promised anything in return for giving consent to entry or search. Valles-Juarez voluntarily consented to the officer's entry into the residence by opening the door and allowing the officers in before Officer Baudler told Valles-Juarez why the officers were present. After, Officer Baudler told Valles-Juarez the ruse, that the officers received a disturbance call at the residence, Valles-Juarez denied any disturbance and voluntarily allowed the officers to conduct a sweep of the residence for other persons.

When all of the occupants of the residence were gathered in the living room, Officer Baudler explained the actual reason for the officer's presence and asked to talk to Valles-Juarez privately. Valles-Juarez agreed and Valles-Juarez and three officers went upstairs to a more private location. The officers explained to Valles-Juarez the information they had about Valles-Juarez and asked to search the residence. Valles-Juarez verbally agreed to the search, then after additional explanations about his rights, signed a consent to search form. Valles-Juarez was assisted in the explanation by a Spanish-speaking officer, appeared to

7

understand what was going on, was not made any threats or promises and was not restrained. It is unclear whether the officers specifically explained to Valles-Juarez that he had the right to refuse a search, however the form clearly stated the right, albeit in English, and the officers gave Valles-Juarez more than one opportunity to refuse the search.  In any event, the failure to inform a suspect of his right to refuse consent to a search does not alone make the consent involuntary.  ***United States v. Alcantar***, 271 F.3d 731, 737 (8th Cir. 2001).

Valles-Juarez did not object to the search nor did he attempt to leave the residence. Valles-Juarez was not placed under arrest until the officers found contraband in the residence. Valles-Juarez did not appear confused or under the influence of alcohol or drugs.  Finally, the period of time from the officers' initial entry until Valles-Juarez's written consent to search was less than thirty minutes.  The Court finds the government has shown that Valles-Juarez voluntarily and knowingly gave consent to enter and search the residence.  Therefore, any evidence found in the residence may be used against Valles-Juarez in the prosecution of the instant offense and Valles-Juarez's motions to suppress should be denied.

## B.    Statements

Valles-Juarez contends any statements he made to officers should be suppressed because the statements were not made voluntarily.  There are two separate sets of statements made by Valles-Juarez during the police presence at his residence on November 16, 2005. First, Valles-Juarez made statements at the time he was asked for consent to search and signed the consent to search form.  Second, Valles-Juarez made statements to officers after contraband was found at the residence and he was arrested.

There is no dispute Valles-Juarez was not warned of his ***Miranda*** rights before he told officers where they would find a firearm in his kitchen.  Therefore, the court must examine whether the statements were made pursuant to a custodial interrogation.    The Self-Incrimination Clause provides:  "No person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  "[T]he core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial."  ***United States v. Patane***, 124 S. Ct. 2620, 2626 (2004).

8

> [I]n *Miranda*, the Court concluded that the possibility of coercion inherent in custodial interrogations unacceptably raises the risk that a suspect's privilege against self-incrimination might be violated. To protect against this danger, the *Miranda* rule creates a presumption of coercion, in the absence of specific warnings, that is generally irrebuttable for purposes of the prosecution's case in chief.

*Patane*, 124 S. Ct. at 2627 (**citing** *United States v. Dickerson*, 530 U.S. 428, 434-35 (2000); *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)). "Interrogation in the *Miranda* context refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (**quoting** *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). There can be no serious contention the officers were asking Valles-Juarez questions which were reasonably likely to elicit an incriminating response. Accordingly, the court finds Valles-Juarez was subject to interrogation during both sets of statements. However,

> Not every confession obtained absent the *Miranda* warnings is inadmissible, however, because "police officers are not required to administer *Miranda* warnings to everyone whom they question. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited."

*United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (**quoting** *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). The "ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (internal marks omitted). The Court must evaluate the objective circumstances surrounding the interrogation, and whether, under those circumstances, "a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *Stansbury v. California*, 511 U.S. 318, 322-23 (1994) (based "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.").

9

Here although, Valles-Juarez was in a bedroom with three officers, under the totality of the circumstances he was not in police custody at the time of his admission there was a firearm in the house. Valles-Juarez agreed to talk to the officers away from his family, for privacy reasons, after he was told about the officers' ruse. Valles-Juarez was not physically restrained, placed under arrest or told he could not leave. The officers told Valles-Juarez of their reasons for contacting him and about the information they received relevant to a drug investigation. The officers did not make any threats or promises to Valles-Juarez. The officers utilized a Spanish speaking officer to translate information to Valles-Juarez when necessary. The officers asked for and received permission to search both verbally and in writing. Under these circumstances, the court finds Valles-Juarez was not in police custody when he told the officers where to find the firearm.

Next, the court must determine whether the defendant's statements were voluntary. The touchstone for the admissibility of a defendant's statements is voluntariness. *Brown v. Mississippi*, 297 U.S. 278, 279 (1936). "The government bears the burden of persuasion and must prove by a preponderance of the evidence the voluntariness of the challenged statements." *United States v. Aguilar*, 384 F.3d 520, 523 (8th Cir. 2004). A court must look to the totality of circumstances in determining whether or not the statements were voluntary. *Mincey v. Arizona*, 437 U.S. 385, 401 (1978); *Colorado v. Connelly*, 479 U.S. 157 (1986); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). In this case, Valles-Juarez was advised of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966) after his formal arrest. There is no evidence Valles-Juarez did not understand the advice of rights. There is evidence he was alert and coherent.

Even though Valles-Juarez was advised of his *Miranda* rights after his arrest, the court must examine the conduct of the law enforcement officials to determine whether or not there was an overreaching by law enforcement officials amounting to coercive police activity for both statements. Coercive police conduct will render a confession inadmissible. *Blackburn v. Alabama*, 361 U.S. 199 (1960). In determining whether a defendant made statements voluntarily, the court must determine if the accused was coerced or his will was overborne and his capacity for self-determination critically impaired. *United States v. Santos-Garcia*, 313

F.3d 1073, 1079 (8th Cir. 2002).  The court must consider the totality of the circumstances, including the specific interrogation tactics employed, the details of the interrogation, and the characteristics of the accused.  *Schneckloth*, 412 U.S. at 225-26.  Coercive police pressure is a predicate to the finding that the confession is not voluntary and violates the accused's due process rights.  *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  However, any police questioning has coercive aspects to it simply by reason of the confrontation.  See *Santos-Garcia*, 313 F.3d at 1079 ("To state the obvious, 'interrogation of a suspect will involve some pressure because its purpose is to elicit a confession.'").  The police officer is part of the law enforcement system that will cause a charge to be made against a suspect.  The questioning by a police officer, while uncomfortable, is not coercive *per se*.  See *Mathiason*, 429 U.S. at 495.

Here, both interviews were very brief.  The officers confronted Valles-Juarez with incriminating information they had received earlier, but Valles-Juarez continued to deny involvement.  In connection with the consent to search, Valles-Juarez admitted knowledge of the firearm, but still denied involvement with drugs.  The officers did not threaten or make promises to Valles-Juarez in induce the statements.  Although Valles-Juarez appeared to understand the officers who spoke in English, an officer with Spanish language skills was used to make sure Valles-Juarez could understand.  The court finds Valles-Juarez's will was not overborne and he made statements to the officers voluntarily.  Therefore, the motion to suppress statements should be denied.  Upon consideration,

**IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP that** Jose H. Valles-Juarez's motion to suppress (Filing No. 22) be denied.

## ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation.  Failure to timely object may constitute a waiver of any objection.  The brief in support of any objection shall be filed at the time of filing such objection.

11

Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 24th day of June, 2005.

BY THE COURT:

 s/Thomas D. Thalken
United States Magistrate Judge